RICHARD ALLEN DIETZ, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dietz v. Commissioner
Docket No. 13912-80.
United States Tax Court
T.C. Memo 1982-533; 1982 Tax Ct. Memo LEXIS 213; 44 T.C.M. (CCH) 1140; T.C.M. (RIA) 82533; September 16, 1982. Richard Allen Dietz, pro se. Donald T. Rocen, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined a deficiency in petitioner's Federal income taxes for the taxable year 1978 of $203,184.38. The issue for decision is whether petitioner realized $326,975 of unreported net income from sales of illicit drugs *214 in that year. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by reference. Petitioner Richard Allen Dietz ("Dietz") resided at Boulder, Colorado, at the time the petition herein was filed. During 1978, petitioner was engaged in the business of selling marijuana, cocaine and heroin. On February 8, 1979, petitioner was arrested by the Boulder Police Department for possession of narcotic drugs, including cocaine and heroin. Subsequently, a search warrant was issued with respect to the motel room in which Dietz was staying at the time of his arrest. Pursuant to the warrant, the police seized various papers in petitioner's handwriting. These papers contained numerous dates and dollar figures; names of individuals were sometimes associated with these figures. Based solely on the documents seized in the search, respondent issued a notice of deficiency determining that petitioner had unreported gross receipts from drug sales in 1978 as follows: Name
Amount
Date
Scott J
$ 63,150
8-1 thru 12-2-78
Tom W.
61,050
8-1 thru 12-2-78
Rad
186,700
8-1 thru 12-2-78
Skip
82,300
8-1 thru 12-2-78
Mr. A.
130,400
8-1 thru 12-2-78
D. Man
10,000
12-27-78
Gary
9,750
12-27-78
Kory
4,500
12-27-78
Kerry
200
12-27-78
Bob Miller
1,000
12-27-78
Bill Hugh
4,800
12-27-78
Gary
9,450
10-13-78
D. Man
10,000
10-13-78
Chic
4,000
10-13-78
Har
4,850
10-13-78
Hogel
4,000
10-13-78
J. Martin
2,300
10-13-78
Miller and Greg
1,000
10-13-78
Robby
14,500
10-13-78
Keve Bus
50,000
10-13-78
Total
$653,950
*215 The notice went on to state: In talking to an agent from DEA, and Sergeant Spotts of Boulder Police Department, Agent learned that a dealer could usually at least double his money on a purchase and resale especially on large resales such as were indicated in confiscated notes. Agent is allowing a 50% cost of sales. Sales
$653,950
X.50
Cost of Sales
$326,975
Respondent determined petitioner's net income from drug dealing to be $326,975 in 1978. The deficiency notice was mailed April 16, 1980. Petitioner then filed a 1978 income tax return which was received by the Internal Revenue Service Center at Ogden, Utah, on July 16, 1980. This return was prepared by petitioner's attorneys and accountant based in part on the information contained in the notice of deficiency. In this return, petitioner, starting from respondent's gross receipts figures, made several downward adjustments to specific entries. In all, these adjustments reduced petitioner's gross receipts to $376,750. Estimating that gross receipts equaled 130 percent of cost of goods sold, petitioner reported cost of goods sold of $289,808 and gross profit of $86,942. Petitioner kept no formal *216 books and records of his drug business in 1978. OPINION Petitioner concedes that he was engaged in drug trafficking in 1978. He also concedes that respondent's method of reconstructing his income from the various scraps of paper found in his motel room is appropriate in the instant circumstances. Petitioner objects, however, to several of the entries in respondent's gross receipts list -- complaining that these entries are either duplicative or not sales at all. Petitioner also argues that his cost of goods sold were a higher percentage of gross sales than the 50 percent respondent has allowed. Petitioner bears the burden of proof. Rule 142(a). [1] The only evidence petitioner introduced on these matters at trial was his own testimony and a schedule he prepared with the assistance of his lawyers and accountant containing numerous proposed adjustments to respondent's figures. Since petitioner has not favored us with a brief and since his testimony was given only in narrative form, we will proceed on the assumption that the adjustments made in petitioner's schedule (which formed the basis of his late-filed 1978 return) are the adjustments at issue. *217 By far the largest adjustment to petitioner's gross receipts at issue is a $186,700 item associated with the name Rad. The slip of paper this item was taken from is dated "8-1-78 thru 12-2-78" and contains the following entries: Scott J.
63,150
Tom W.
61,050
RAD
186,700 + 30% last half
Skip M.
82,300 + 16% last half
Mr. A.
130,400 + 16% last half
Received Chgo 11-29, final 12-14 New York
Respondent concluded that each of the numbers on their paper represented dollar sales and included them all in petitioner's income. Petitioner's schedule subtracts only the entry for "RAD" from sales, explaining that "RAD" is an abbreviation for petitioner's name, Richard Allen Dietz. At trial petitioner testified that the sums of money reflected on the slip of paper actually represented monies received from various third parties as "investments" on marijuana. The following colloquy with the Court also took place: Q How about Rad, 186,700 plus 30 percent -- what's that say -- last half? A Last half. Q What does that mean? A That's what he invested plus 30 percent of the last deal. [Emphasis supplied.] Petitioner's testimony suggests that *218 Rad in fact may have been a third party. Since there is confusion on this point, all of which has been created by petitioner himself, we hold that petitioner has failed to meet his burden of proof with respect to this $186,700 item and that respondent appropriately treated this item as a gross receipt of petitioner's drug business. The remaining gross receipts at issue were all derived by respondent from names and numbers contained on two separate pieces of paper, dated 10-13-78 and 12-27-78, respectively. Petitioner's testimony and our own examination of these and other papers seized from petitioner's motel room convinces us that the entries at issue all reflect outstanding loan balances of debts due from third parties arising out of petitioner's drug sales to those third parties. Since petitioner kept no formal books and records under any particular method of accounting, we hold that respondent is entitled to require petitioner to recognize income to the extent of these credit sales in 1978. Section 446(b). [2]
*219 Petitioner concedes that these items are appropriately classifiable as income, but maintained at the trail 1) that several loan balance entries on the sheet dated 12-27-78 are merely carryovers of the loan balance entries on the sheet dated 10-13-78 and thus should not be included in income twice, 2) that several of these entries represent retainer fees or other fees paid to petitioner's lawyer and are not income items and 3) that along with other errors in reading petitioner's handwriting, respondent's entry "Keve Bus $50,000" should really be "Kev & Bub $500 ea." -- necessitating a $49,000 adjustment. Respondent denies any error. Our views as to these items are discussed subsequently herein. We agree with petitioner that the $10,000 entry for D. Man on 12-27-78 is a carryover loan balance from the sheet dated 10-13-78 and does not represent any new sale of narcotics. Accordingly, petitioner's gross receipts should accordingly be reduced by $10,000.
We also agree with petitioner that the entry of 12-27-78 for Gary, in the amount of $9,750, substantially duplicates the entry for Gary of $9,450 on 10-13-78, and petitioner's gross receipts should be reduced by the lower of the *220 two figures. The entry for "Bill Hugh" of $4,800 on 12-27-78 appears in actuality to be an entry for Bill Nagle (sometimes spelled "Nagel" on other sheets kept by petitioner) of $4,000 on that date. This entry matches a $4,000 entry for "Nagel" (mis-read as "Hotel" by respondent) on 10-13-78. As with the two prior instances, we think that only one $4,000 sale is involved with these entries. Consequently, petitioner's gross receipts should be further reduced by $4,800. Petitioner contends the $4,500 entry for "Kory" and the $200 entry for "Kerry" on the 12-27-78 sheet are erroneous repetitions of the entries for Gary on that date (see above). We disagree. In the prior instances where we have found a duplication we found an entry on the 12-27-78 sheet which matched an entry on the 10-13-78 sheet. We have already found a match between the entry for Gary on the 12-27-78 sheet ($9,750) and the 10-13-78 sheet ($9,450). Given petitioner's method of recording loan balances, it simply would not make sense for petitioner to have recorded several different entries for Gary on 12-27-78. In fact, it is clear from the 12-27-78 sheet that although respondent's names "Kory" and "Kerry" *221 might not be precisely accurate, the "Gray," "Kory" and "Kerry" entries all involve different names and different people. Accordingly, we see no reason to adjust respondent's list of petitioner's gross receipts on account of these entries. Petitioner next argues that the $1,000 entry for "Miller and Greg" on 10-13-78 is the same as the $1,000 entry for "Bob Miller" on 12-27-78 and that these entries represent a $1,000 retainer fee paid by petitioner to his lawyer, Robert Miller, of the firm of Miller and Greg; thus they are not income. In addition, petitioner contends that the $14,500 entry for "Robby" on the 10-13-78 sheet relates to petitioner's attorney and includes a $10,000 item which also constituted attorney's fees. While we concur that the $1,000 entry on 12-27-78 is a duplicate (and thus petitioner's gross receipts should be reduced by $1,000), we are simply unable to conclude on this record that the other two entries dated 10-13-78 and anything other than debts created in the course of drug sales.[3] The entries were recorded in the same manner and location as other drug sale debt entries. It also does not appear to have been petitioner's practice to record ordinary *222 expense items on the confiscated sheets of paper; for the most part, he kept track only of money on hand and debts owed to him. Petitioner did not explain why he recorded these alleged expense items in violation of his usual practice. Accordingly, we make no adjustment on account of the $14,500 or remaining $1,000 item. Petitioner's request to reduce the sales figures of 10-13-78 for "Har" ($4,850) and "J. Martin" ($2,300) by $1,200 and $150, respectively, appears to be based on notations on a piece of paper dated 12-31-(78?) indicating petitioner's receipt of cash from these individuals on account of the sale of several grams or portions of an ounce of an unspecified narcotic. The dates of such sales are not given. Respondent has not determined any additional gross receipts *223 on account of these apparent sales to Har or J. Martin noted on the 12-31-78 sheet. If these sales were separate from the 10-13-78 sales, this was clearly an error in petitioner's favor on respondent's part and he is entitled to no further downward adjustments of these items. Petitioner's final gross receipts adjustment relates to an entry on the 10-13-78 sheet which respondent read as "Keve Bus 50,000." Petitioner claims the entry should really be "Kev & Bub 500 ea." According to petitioner, the entry indicates a sale of drugs on credit to two individuals, Kev and Bub, for $500 each. Consequently, petitioner argues, $1,000 of sales were involved, not $50,000, and a $49,000 downward adjustment in gross receipts is warranted. We agree with petitioner. First, although the writing is not the most legible, it appears to comport more with petitioner's explanation. Secondly, the sheet dated 12-31-(78?), referred to above, very legibly records an outstanding debt on that date from Kev for $500. It also records a payment of $300 by "Bubs" and a remaining outstanding debt from "Bubs" of $200. This tends to corroborate petitioner's contention that the original 10-13-78 entry consisted *224 of two separate sales in the amount of $500 each. While the matter is not entirely free from doubt, we hold petitioner has met his burden of proof on this item. In summary, we hold respondent's $653,950 gross receipts figure should be reduced by $74,250 [4] to $579,700. Petitioner's final argument is that respondent's allowance of 50 percent of gross receipts as cost of goods sold was inadequate. Petitioner contends that his gross receipts were 130 percent of cost of goods sold. According to the notice of deficiency, respondent's determination of cost of goods sold was based on conversations with the Drug Enforcement Administration and local police. Petitioner at trial offered no evidence to support his position that his cost of goods sold were any higher than allowed by respondent. [5] Accordingly, petitioner has failed to meet his burden of proof on this issue and respondent's determination must be upheld.[6]
*225 Decision will be entered under Rule 155.
Footnotes
1. All references to Rules are to the Tax Court Rules of Practice and Procedure. Additionally, unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the year at issue.↩
2. Section 446(b) provides: (b) EXCEPTIONS.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.↩
3. We by no means intend to impugn the integrity of petitioner's former attorney, Robert Miller (who did not testify or represent petitioner herein) by suggesting that Miller purchased drugs from petitioner. However, on the instant record we can only conclude that petitioner has not met his burden of showing these disputed entries to relate to anything other than respondent's assertion, drug sales.↩
4. This figure is determined as follows: ↩
Downward
Name
Adjustment
D. Man
$10,000
Gary
9,450
Bill Nagle
4,800
Bob Miller
1,000
Kev & Bub
49,000
Total
$74,250
5. Contrast Edmondson v. Commissioner,T.C. Memo. 1981-623↩. 6. We note that section 280E, recently added to the Code by section 351 of the Tax Equity and Fiscal Responsibility Act of 1982, P.L. 97-248, Stat.    , which disallows all deductions and credits for amounts paid or incurred in a business of trafficking in illegal drugs, is not applicable to the 1978 tax year.↩